**Opinion filed November 17, 2011**



In The

# Eleventh Court of Appeals

_____

## No. 11-09-00346-CR

_____

## VIRGIL LEONARD DUNCAN, JR., Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 385th District Court**

**Midland County, Texas**

**Trial Court Cause No. CR35806**

**M E M O R A N D U M   O P I N I O N**

Appellant, Virgil Leonard Duncan, Jr., was indicted for the offense of burglary of a habitation in eight counts. Each count related to a burglary at a different home and alleged an enhancement paragraph regarding appellant's prior felony conviction for evading arrest. The State subsequently abandoned counts 1, 3, and 7. Appellant entered a plea of "not guilty." The jury found appellant not guilty in count 2 but guilty of the felony offense of burglary of a habitation in counts 4, 5, 6, and 8. Based on the jury's findings of guilt, the trial court sentenced

appellant to fifteen years in the Institutional Division of the Texas Department of Criminal Justice in each count. The sentences are to run concurrently.

In appellant's one issue on appeal, he argues that the evidence was legally and factually insufficient to convict him of the felony offense of burglary of a habitation. We affirm.

*Background Facts*

During January 2009, there were a number of residential burglaries on the northeast side of Midland. The counts in appellant's indictment included the home of Irma Briggs at 1723 Maple (count 2), the home of Tamara Riojas at 813 West Spruce (count 4), the home of Stanley O'Neal at 104 West Shandon (count 5), the home of Angela Sanchez at 417 East Shandon (count 6), and the home of Mary Armendarez at 4312 Crenshaw (count 8).

Detective Manuel Beltran, who investigated the burglaries, testified that the burglaries followed a pattern. The burglaries would occur in the early morning or early afternoon. Detective Beltran first encountered appellant in an alley very near 4312 Crenshaw shortly after an attempted burglary at that address.

At around eleven in the morning on January 26, 2009, the police received a call about an attempted burglary by two men at 4312 Crenshaw. The caller described one man as being black and the other as possibly being Hispanic. Armendarez, the owner of the home, had first heard someone banging on her door. She looked through the blinds in her bedroom and saw two men walking on the sidewalk. After calling her neighbor and leaving a message about the banging on her door and the two men, Armendarez then went to her kitchen and saw one of the men coming in the kitchen window. His arms and head were already in the window. Armendarez screamed at him that she was calling the police. After Armendarez screamed, the man left. Because the man had a light complexion, Armendarez thought he was Hispanic. She dialed her neighbor again who then called the police.

Detective Beltran arrived at the Armendarez residence minutes after the police received the call. Armendarez pointed in the direction that the men had gone, and Detective Beltran went that way for about one hundred and fifty feet when he encountered appellant, a dark, African-American male. As Detective Beltran approached appellant, appellant told him that he was not the one Detective Beltran was looking for. Appellant said he was just there to whistle. Detective Beltran understood that to mean that he was a lookout. Appellant told the detective that he was on the way to the mall to buy some shoes when Eric Ray Post and a

2

Hispanic male told him that they were "going to do a lick" (break into house) and that all he had to do was whistle if he saw the police. Appellant said that the white male, Post, was one of the two men involved in the burglary at 4312 Crenshaw and that Post lived at the Ranchland Apartments. Leaving appellant in the custody of another officer, Detective Beltran went to look for the other man.

Other officers were pursuing an individual east of Airpark. When Detective Beltran arrived in that area, the officers had Joshua Nichols in custody. Detective Beltran recognized Nichols, a light-skinned African-American, as someone he knew. Nichols was cooperative and gave a statement to Detective Beltran about his involvement in the burglaries. Nichols told Detective Beltran that the only other person involved in the burglaries was appellant. After taking Nichols's statement, Detective Beltran changed the status of appellant from witness to codefendant.

Appellant had rings on his fingers that belonged to a family named Briggs who lived at 1723 East Maple. One of the rings had the name "Briggs" inside the band. Appellant also had in his possession a unique, little cupid angel holding a heart with a cross pendant and a gold crucifix with a chain. Officers identified these items as belonging to Angela Sanchez at 417 East Shandon. Detective Beltran also identified two black gloves that had been in appellant's bag.

At police headquarters, Detective Beltran placed Nichols and appellant in the same room in an attempt to determine if Post existed and if he was part of the offense at 4312 Crenshaw. He did this because Nichols told him that Post was not involved. Nichols confirmed that conversation with appellant, saying that he told appellant to come clean and tell the police that no one named Post was involved. Appellant subsequently told Detective Beltran that Post was not involved in the attempted burglary at 4312 Crenshaw. That was after Nichols confronted appellant in Detective Beltran's presence and told appellant, "Don't involve somebody who doesn't need to be involved."

Post testified at trial and denied any knowledge of the burglaries. Post admitted that he met appellant a couple of times when he lived at the Santa Fe Apartments because appellant hung out with Post's friend. Post said he was not anywhere near 4312 Crenshaw on January 26, 2009. The State also called Jerry Ewing, the owner of Ewing Landscape, as a witness. He testified that Post was an employee of his and that his employee records showed that Post was at work for him on January 26, 2009. Ewing said that Post was a reliable employee.

Detective Beltran checked a national database of pawned property where officers can see if an individual has pawned property anywhere in the United States. He found that appellant had pawned some of the stolen property at Cash America Pawn on North Big Spring Road. He also determined that appellant had attempted to pawn a laptop computer but that Cash America Pawn refused the laptop. After reviewing appellant's pawn tickets at Cash America Pawn, Detective Beltran retrieved some game cartridges, a man's ring, a lady's ring that had the name "Irma on it," a Nintendo video game system, and some other jewelry. Briggs identified her husband's ring that appellant had pawned. Angelica Morales, the manager at Cash America Pawn, confirmed the items that had been pawned by appellant.

When confronted with the pawned items and the stolen items in his possession, appellant told Detective Beltran that he would plead to being in possession of stolen property, but not to burglary because burglary is a felony. Appellant had claimed that some of the stolen property had been given to him by his girlfriend a long time ago and that some of the property belonged to his cousin. But the property he claimed was from his girlfriend was property that belonged to Sanchez and had been reported stolen that day. Appellant admitted to Detective Beltran that he had tried to pawn a laptop and was turned down. In his testimony, Nichols confirmed that he gave appellant the laptop to pawn because he did not have an identification card. When the pawnshop turned appellant down, Nichols said they put the laptop and the stolen bag of clothes in a dumpster near the pawnshop.

The initial description given to Detective Beltran of the dark African-American was that he was a black male in his twenties wearing a black, short-sleeved shirt with a white, long-sleeved shirt underneath it. Armendarez said that appellant was wearing a white shirt when the officers found him but that earlier he was wearing a black jacket. When the detective encountered appellant, appellant was dressed all in white. But another officer told Detective Beltran that he had found a jacket and a wallet by a dumpster, and he gave them to Detective Beltran. The wallet contained an identification card with appellant's name.

Nichols testified that he had pleaded guilty to three counts of burglary of a habitation and received a twenty-year sentence. His testimony at this trial was not part of his plea bargain. Nichols admitted that he and appellant broke into a number of houses that day in addition to the house at 4312 Crenshaw. Nichols said that he had opened the window at 4312 Crenshaw and stuck his arm through the window when he saw someone in the house. Appellant was with him

4

because they both had intended to go into the house. They both ran into an alley when the homeowner saw Nichols and screamed. At some point, appellant dropped his phone and stopped to look for it.

Nichols claimed that he did not know Post. He remembered the house on Spruce Street where the laptop was taken and said that the amount of cash that he took from that house was $300, not $1,200. That laptop was the only laptop taken, and Nichols said he only planned to pawn the laptop. He did not know what appellant pawned that day. If appellant pawned something other than the laptop, it was not an item that Nichols had given him.

Nichols could not remember whether it was his idea or appellant's to break into houses. His usual manner of breaking into a house was to kick in the front door or go through a window. When shown a picture of some jewelry, Nichols said it was jewelry that appellant was wearing that day but that he did not know where appellant got the jewelry. He testified that, at times, they would separate when they were in a house and that they did not always share what each took. Nichols also said that, at times, he would stand in the yard as a lookout when appellant went in a house and that, at other times, appellant would stand in the yard while Nichols went in. Nichols identified the bank bags that he took from the Riojas home and said that one of the bags had money in it. He stated that he did not tell appellant about the money but that he had intended to share the proceeds from pawning the laptop with appellant.

Nichols testified that he and appellant both entered the house of Stanley O'Neal who was related to Nichols's stepfather. Nichols identified the PlayStation and bag of clothes that they took from O'Neal's house and recalled their putting the laptop and clothes behind a dumpster. Nichols could not identify the houses by their addresses, he simply showed Detective Beltran which houses they burglarized.

Appellant testified in his defense. Appellant said that he thought Nichols was his cousin, but he denied that he ever went with Nichols to do any of the burglaries. Even though he heard Nichols testify that he had no deal with the district attorney's office, appellant claimed that Nichols was testifying against him to get a "time cut." Although Detective Beltran had testified that appellant told him that his girlfriend had given him the rings belonging to the Briggs, appellant testified that Nichols had brought the rings to appellant's house while Nichols was staying with appellant. Appellant admitted that he pawned a Nintendo Wii system and games for Nichols, as well as a gold ring.

Appellant's version was that Nichols had suggested that they pick up Post. After they picked him up, Post borrowed appellant's phone, and then Post and Nichols told appellant that they wanted to go to Post's girlfriend's house. Appellant claimed that he was just sitting on the curb waiting for them when Nichols and Post came running past him. Post told appellant that he had dropped appellant's phone in the alley. Appellant was looking for his phone when he met Detective Beltran. Appellant admitted that he gave a false name to Detective Beltran. Appellant said that he told Detective Beltran that it was Post and some Hispanic-looking male because appellant did not want to get Nichols into trouble. Appellant first testified that it was Post who told him they had "hit a lick." A little later, appellant said it was Nichols who told him that. He denied ever saying anything to Detective Beltran about whistling.

Although appellant testified that he had been convicted only once for failure to identify himself, the State presented him with three different judgments convicting him of that offense. Appellant insisted that the Midland court records were not accurate. Appellant claimed that Detective Beltran was mistaken when Detective Beltran testified that he did not have a gun drawn when he encountered appellant. When the State asked appellant why he had gloves on him when the police encountered him, he denied having gloves and said that the police must have been mistaken. The State reminded appellant that Detective Beltran had testified that he retrieved two of the rings from the pawnshop that were on appellant's pawn ticket. Appellant claimed that that was not accurate because appellant was wearing those two rings and not a ring with the name "Briggs" on it.

*Standard of Review*

Appellant's legal and factual insufficiency issue was written before the decision in *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010). The Texas Court of Criminal Appeals concluded in *Brooks* that there was "no meaningful distinction between the *Jackson v. Virginia*[1] legal-sufficiency standard and the *Clewis*[2] factual-sufficiency standard." *Brooks*, 323 S.W.3d at 902. The *Brooks* court held that the *Jackson v. Virginia* standard is the "only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Id.* at 912. Under this standard, we must review all of the evidence in the light most favorable to the

---

[1] *Jackson v. Virginia*, 443 U.S. 307 (1979).

[2] *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996).

verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. at 319.

The jury, as the finder of fact, is the sole judge of the weight and credibility of the witnesses' testimony. TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007), art. 38.04 (West 1979). The jury has the responsibility to resolve conflicts in the testimony and to draw reasonable inferences from basic facts to ultimate facts. *Jackson v. Virginia*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In our review, we must determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). The standard of review is the same for direct and circumstantial evidence. Circumstantial evidence is as probative as direct evidence in establishing the guilt of a defendant. *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13.

Ordinarily, to hold evidence legally sufficient to sustain a conviction for burglary of a habitation, the evidence must demonstrate that (1) an individual entered a habitation; (2) without the effective consent of the owner; (3) in order to commit or attempt to commit a felony, theft, or assault. TEX. PENAL CODE ANN. § 30.02(a)(3) (West 2011). However, TEX. PENAL CODE ANN. §§ 7.01–.02 (West 2011) allow individuals to be charged as a party to an offense and to be held criminally responsible for the conduct of another when that individual acts in concert with another person in committing an offense. Circumstantial evidence alone may be used to prove that a person is a party to an offense. *Powell v. State*, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006); *Beardsley v. State*, 738 S.W.2d 681, 684 (Tex. Crim. App. 1987). An individual may be guilty of burglary of a habitation even though he does not personally enter the burglarized premises if he is acting together with another in the commission of the offense. *Powell*, 194 S.W.3d at 506–07; *Clark v. State*, 543 S.W.2d 125, 127 (Tex. Crim. App. 1976).

Based on the evidence, the jury could have found appellant guilty as a principal or as a party to the various burglaries. For example, the jury could have believed that appellant was a lookout at 4312 Crenshaw or could have believed Nichols's testimony that appellant was with him and planning to enter the house with Nichols.

There was legally sufficient evidence to convict appellant. At 4312 Crenshaw, the Armendarez home, appellant was found in the alley about one hundred and fifty feet from the

house just minutes after the attempted burglary. Appellant told Detective Beltran that he was only there to whistle after he was told that two men were going to "hit a lick." Nichols testified that appellant was the other man and that appellant was with him when he tried to enter the Armendarez home. Nichols has a light complexion; it is not surprising that Armendarez described him as looking Hispanic. Appellant testified that he had a white shirt on that day. Armendarez described appellant as wearing a white shirt when the officers found him but said that earlier he was wearing a black jacket. The officer who found appellant's wallet also found a jacket near appellant's wallet.

Appellant was found with a crucifix with a gold chain and a little cupid with a heart pendant in his possession. Appellant told Detective Beltran that the crucifix and pendant had been given to him by his girlfriend, but in his testimony, appellant denied that statement and said he told Detective Beltran that Nichols had given them to him. Sanchez identified those items as belonging to her and among the items taken from her home at 417 East Shandon. Sanchez had returned home on January 26 and found that her door had been kicked in. Part of the door frame was lying on the floor. She also said that some of her jewelry that was taken had not been returned.

Nichols testified that he and appellant both took items from the O'Neal home at 104 West Shandon. The bag of clothes that was put with Riojas's laptop near a dumpster belonged to O'Neal's son. The house at 104 West Shandon was only two blocks from Cash America Pawn where appellant attempted to pawn the laptop. O'Neal testified that among the items taken from their house were his son's missing "M3 player" and clothing (including twelve shirts and shorts) that his son kept in an American Eagle Outfitters bag.

Riojas identified the Toshiba laptop and bank bags that were taken from her house at 813 West Spruce. Although Nichols said he had only taken $300 from one of the bank bags, Riojas testified that she had $1,200 in cash and checks in one of the bags. Although the serial number had been rubbed off, Riojas was able to identify the laptop as the one used for her husband's business because she had all the documentation that came with the computer.

Although the jury found appellant guilty of the other burglaries, the jury found appellant not guilty of the burglary of the Briggses' residence at 1723 Maple. Yet, appellant had on his fingers custom-made rings the Briggses owned when Detective Beltran found him. Appellant had also pawned a lady's ring that had the name "Irma" on it; Briggs's first name was Irma.

We hold that a rational trier of fact could have found the essential elements of the crimes in counts 4, 5, 6, and 8 beyond a reasonable doubt.  Appellant's sole issue is overruled.

*This Court's Ruling*

The judgment of the trial court is affirmed.


TERRY McCALL

JUSTICE


November 17, 2011

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of:  Wright, C.J.,
McCall, J., and Hill, J.[3]

---

[3]John G. Hill, Former Justice, Court of Appeals, 2nd District of Texas at Fort Worth, sitting by assignment.